UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
VERNON THORPE, ROBERT ALONZO, VERONICA
BROWN, VICTOR BYNUM, GLEN EDWARDS,
CHARLES JENKINS, KENNETH MOODY, ROBERT
ALBERT, ADA BERKELY, JOSEPHINE GLOVER,
ELIZABETH GUILAMO, BRUCE HIBBERT, SR.,
ROBERT LEWIS, ROBIN POINDEXTER,
JEFFREY RYAN, ERNST DESRUISSEU, THOMAS
DOHERTY, CARLOS BLACKMAN and JOHN
SIMINO,

                            Plaintiffs,                       00 Civ. 3144 (GBD)

       -against-                           MEMORANDUM OPINION
                                                  & ORDER

ANTHONY LUISI, JOSEPH RAGUSA, GEORGE
CORTES, GRIER EDWARDS, CHARLES
WILLIAMS, AHMAD HASSAN, JOSE ZACHARIAH,
ARTHUR CORPUZ, EUGENE FRIGONE, and
ROBERT MESNARD, and the NEW YORK CITY
TRANSIT AUTHORITY,

                         Defendants.
-----------------------------------------------------------------x
GEORGE B. DANIELS, DISTRICT JUDGE:

      Plaintiffs move, pursuant to Fed.R.Civ.P. 60(b), for relief from this court's May 18, 2005

order dismissing this case for failure to prosecute. As plaintiffs have failed to establish excusable

neglect or extraordinary circumstances justifying vacatur, and an analysis of the claims in the

complaint reveals that this court would grant defendants' summary judgment motion if the

dismissal for failure to prosecute were vacated, plaintiffs' motion is denied.

      Plaintiffs, nineteen employees of the New York City Transit Authority ("Transit

Authority"), move this court to reconsider its order dismissing their complaint for failure to

prosecute under Fed.R.Civ.P. 60(b)(1) and (6). This court granted defendants' motion for

dismissal on May 18, 2005 as a result of plaintiffs' failure, over a nearly two-year period, to respond to defendants' summary judgment motion or motion to dismiss for failure to prosecute. A brief recitation of plaintiffs' inattention to their case, drawn from the May 18th order, is essential to the following analysis.

Defendants moved for summary judgment on August 5, 2002. After failing to timely file opposition papers in early September of that year, plaintiffs wrote the court requesting an extension, which was granted. Having failed to present opposition papers by the extended filing date, plaintiffs asked for another extension. Although the court granted this second untimely request for more time, plaintiffs failed to file any papers at the close of that period. Plaintiffs sent two subsequent letters to the court asserting that they had secured defendants' consent for additional extensions, letters that defendants now claim were misrepresentations of their conversations. In July of 2003, defendants filed a motion to dismiss the case for failure to prosecute, to which plaintiffs responded only by asking for yet another extension. Defendants sent several letters to both plaintiffs and the court in the ensuing two years seeking resolution of the pending motions. Receiving no response from plaintiffs, this court granted defendants' motion to dismiss on May 18, 2005. Two days later, plaintiffs filed a request to move for reconsideration with an accompanying affidavit by plaintiffs' counsel indicating several reasons for his failure to pursue this case. Given the nature of that affidavit, this court refused to entertain such a motion unless plaintiffs retained new counsel. In the ensuing weeks, plaintiffs filed a motion for reconsideration[1] before this court after filing a notice of appeal of the dismissal to the Second Circuit.

---

[1] As of July 21, 2005, each plaintiff has substituted new counsel for the purposes of this motion.

## I. JURISDICTION

Plaintiffs have stripped this court of jurisdiction over the instant motion by appealing to the Second Circuit this court's May 18, 2005 dismissal of their complaint for failure to prosecute. Toliver v. County of Sullivan, 957 F.2d 47, 49 (2d Cir. 1992). A limited exception exists to the general rule that district courts lose jurisdiction upon appeal of a final judgment. Although a district court may not grant relief from judgment under Rule 60(b) without permission from the Circuit Court, "the district court can entertain and *deny* the Rule 60(b) motion." Id. (citing Ryan v. United States Line Co., 303 F.2d 430, 434 (2d Cir.1962) (emphasis in original).

Further, considerations of judicial efficiency prompt this court to engage in an analysis of plaintiffs' dismissed complaint in order to indicate to the Second Circuit the unlikelihood that plaintiffs would succeed upon remand to this court. Lawrence v. Cohn, No. 90 Civ. 2396, 1992 WL 18801 (S.D.N.Y. Jan. 28, 1992) (citing Litton Systems v. American Tel. & Tel. Co., 746 F.2d 168, 171 n. 4 (2d Cir.1984) (citing Ryan, 303 F.2d at 434)).

## II. STANDARD FOR RELIEF UNDER RULE 60(B)

Plaintiffs seek relief from judgment pursuant to Fed.R.Civ.P. 60(b), which permits a court, in its discretion, to rescind a final order for "(1) mistake, inadvertence, surprise, or excusable neglect," or "(6) any other reason justifying relief from the operation of the judgment." These two subsections are mutually exclusive. United States v. Erdoss, 440 F.2d 1221, 1223 (2d Cir. 1971). Thus section " b)(6) applies only when no other subsection [e.g., (b)(1)] is available." Nemaizer v. Baker, 793 F.2d 58, 63 (2d Cir. 1986).

1. <u>Rule 60(b)(1)</u>

The United States Supreme Court has deemed excusable neglect "an elastic concept," identifying four factors which courts should weigh in evaluating a movant's putatively excusable conduct: "1) the danger of prejudice to the [non-moving party], 2) the length of the delay and its potential impact on judicial proceedings, 3) the reason for the delay, including whether it was within the reasonable control of the movant, and 4) whether the movant acted in good faith." <u>Pioneer v. Brunswick</u>, 507 U.S. 380, 392-95 (1993). The Second Circuit stresses that the "third factor - the reason for the delay . . . predominates." <u>Williams v. KFC Nat. Management Co.</u>, 391 F.3d 411, 415-416 (2d Cir. 2004); <u>see</u> <u>also</u> <u>Silivanch v. Celebrity Cruises, Inc.</u>, 333 F.3d 355, 366-367 (2d Cir. 2003).[2]

Plaintiffs' counsel has submitted a self-flagellating declaration asserting that his neglect of his clients' case was caused by events that arose in his personal and professional life during the period following defendants' motion for summary judgment. The Second Circuit, however, regularly refuses to vacate judgments pursuant to Rule 60(b)(1) due to an attorney's "inability to efficiently manage his caseload," whether for personal or professional reasons. <u>United States v. Cirami</u>, 535 F.2d 736, 739 (2d Cir. 1976). Despite counsel's personal circumstances, the neglect of this case is inexcusable given the legal resources available to plaintiffs by other members of the law firm which represented them. Individual counsel attempts to shoulder the entire responsibility for the failure to respond to defendants' motions. However, documents produced to this court by both parties reveal that other attorneys in his firm were actively involved in this litigation. Of thirty-four depositions taken in the case, this attorney was present at only ten; five

---

[2] As this factor is determinative in the instant analysis, the court need not examine the other factors.

other attorneys from his law firm variously attended the remaining twenty-four. (Defs.' Br. in Opp. to Mot. for Recons., Ex. T).  In July, 2003, another name partner at the law firm sent a letter to this court on behalf of the attorney of record, acknowledging the pending motions for dismissal and summary judgment. (Id., Ex. K).  Further, it has been represented that the firm chose, on at least some other firm matters, to develop systems to prevent this kind of neglect and to encourage colleagues to assist each other. ("My office set up a triple-check system to make sure that attorneys scheduled to be at [the Public Employment Relations Board] were present when required . . . Between December 2001 and March 2005 . . . no other scheduling snafus occurred")).  Ultimately, it is clear that several attorneys in the law firm worked on and were familiar with this case.  Others in the firm were also aware of this attorney's personal problems and that they were affecting his work performance.

    2. Rule 60(b)(6)

    Although counsel's negligence is not excusable under Rule 60(b)(1), *gross* negligence of attorneys has occasionally served as grounds for relief from judgment under Rule 60(b)(6). Cirami, at 536 F.2d at 740 (citing L.P. Steuart, Inc. v. Matthews, 329 F. 2d 234 (D.C. Cir. 1964)). Relief under this subsection, however, is typically available only where movants present evidence of "'extraordinary circumstances,' or 'extreme hardship.'" Harris v. United States, 367 F.3d 74, 81 (2d Cir. 2004) (quoting Cirami, 563 F.2d at 32).  In fact, in order to constitute "extraordinary circumstances," an attorney's failures "must be so egregious and profound that they amount to the abandonment of the client's case altogether, either through physical disappearance, see Vindigni v. Meyer, 441 F.2d 376 (2d Cir. 1971), or constructive disappearance, see Cirami, 563 F.2d at [377-78]." Id.  Additionally, even the gross negligence of

an attorney will be imputed to his clients barring evidence of "diligent efforts by [the clients] to induce him to fulfill his duty." Dominguez v. United States, 583 F.2d 615, 618 (2d Cir. 1978); see also Vindigni, 563 F.2d at 377.

Plaintiffs' attorney has informed the court of a series of personal problems that he argues either excused his neglect or constituted extraordinary circumstances justifying reconsideration of his clients' complaint. Documents produced by both sides in this case, however, reveal that whatever strain the attorney underwent did not prevent him from continuing to practice law and involving himself in community affairs. Although his law practice may genuinely have suffered during the relevant period, his own declarations in support of this motion indicate that he remained active on a number of fronts.[3] That he was selective in deciding which areas of his law practice to focus on does not establish an extraordinary circumstance in this case. Although he may have been "unfocused and distracted" during his period of inaction in this case, he remained an active attorney. (Pls.' Reply Decl., ¶ 13(g)).

The 60(b)(6) analysis also considers whether the plaintiff litigants themselves neglected their lawsuit, and to what extent counsel may have misled them into complacency. The attorney represents that his clients "were unaware of [his] failure to oppose the summary judgment motion and [his] failure to oppose a motion to dismiss, and believed that [they] were simply waiting for a

---

[3] Discussing summer and fall of 2002, during which he failed to answer defendants' summary judgment motion and asked for four separate extensions, none of which he honored, the attorney writes that he was involved in "extensive" contract negotiations on behalf of the same union to which the clients in this case belong, that he "attend[ed] to the Union's regular business," and involved himself in "additional litigation." (Pls.' Decl. in Supp. of Mot. for Recons., ¶ 3(d)). Although he describes his political activities as "minimal," he remained active enough in elected and community politics to attract press attention, "gather[ed] signatures in protest" when he was removed from a board, (Pls.' Reply Decl. at ¶ 8), and announced re-election plans in February, 2005. (Id. at ¶ 11). During 2003 to 2005, he acknowledges being involved in actions before the Public Employment Relations Board, as well as bringing actions to enforce arbitration awards. (Id. at ¶ 13(a)-(b)).

decision from the Court." (Pls.' Reply Decl., ¶ 3). He further claims that "[plaintiff Vernon] Thorpe probably asked me what was going on once a month, and I simply told him 'no decision yet.'" (Id.). These assertions to clients do not amount to the kind of affirmative, misleading assurances that lead courts to determine that a plaintiff's obligation to monitor his own litigation was overborne by counsel's deception. See Cirami, 563 F.2d at 34. Of nineteen plaintiffs in this case only one, plaintiff Vernon Thorpe, apparently maintained continuing contact with the attorney and his law firm. (Pls.' Reply Decl., ¶ 3). That other plaintiffs may have chosen Thorpe to serve as their liaison with the law firm did not extinguish their duty to remain aware of the state of their lawsuit, especially over the course of several years. Most revealing of plaintiffs' culpable lapse in attention, however, is plaintiff Thorpe's admission that "shortly after [defendants' summary] judgment motion was filed, I noticed that [the attorney] was less forthcoming and less accessible to me." (Aff. of Vernon Thorpe, Pls.' Reply Decl.). Given Thorpe's acknowledgment that he witnessed his attorney's behavior change from "[taking] an active role in this litigation" to "less forthcoming and less accessible," this court cannot find that plaintiffs were diligent in attending to their lawsuit. (Id.) In the absence of either extraordinary circumstances justifying counsel's behavior or attentiveness on the part of plaintiffs, no relief from judgment under Rule 60(b)(6) is warranted.

III. LIKELIHOOD THAT THIS COURT WOULD RULE IN PLAINTIFFS' FAVOR UPON VACATUR

This court informed plaintiffs that it would not consider a motion to vacate without an accompanying submission of plaintiffs' proposed response to defendants' summary judgment motion. Having received and considered such a submission, and in order to aid the Second Circuit in its consideration of plaintiffs' appeal, this court will address the merits of plaintiffs'

complaint to indicate its disposition toward the underlying summary judgment motion. Judicial efficiency may warrant the Circuit Court's consideration of the district court's conclusion, despite the latter having no jurisdiction, because "[i]t would be an absurdity to require appellant to return to the district court after this appeal is decided, there formally moving . . . and then filing a new appeal from the inevitable denial." Ryan, 303 F.2d at 434; cf. Litton Sys. v. Am. Tel. & Tel. Co., 746 F.2d 168, 171 n.4 (2d Cir. 1984).

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Nebraska v. Wyoming, 507 U.S. 584, 590 (1993). The moving party bears the burden of demonstrating that no factual dispute exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56 (e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Serv., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994).

1. Factual background

Each of plaintiffs' claims stems from a period of workplace friction in early 2000 on the ten p.m. to six a.m. shift at the Transit Authority's 240th Street Maintenance Facility (the "shop") that culminated in the suspension or discharge of sixteen of the plaintiffs on March 1st, 2000. In

the days preceding that incident, a number of the plaintiffs had filed complaints about shift supervisor and defendant Ahmad Hassan ("Hassan") with the Transit Authority, alleging abusive practices, intimidation, and discrimination on the basis of race and sex. On the night of March 1st, according to both plaintiffs' and defendants' statements of undisputed facts and depositions, plaintiff Vernon Thorpe ("Thorpe"), the Local 100 union shop steward, asked Hassan for permission to conduct a union meeting during the shift.[4] Hassan granted Thorpe permission to hold the meeting during either break or lunch time. Thorpe chose to call the meeting to order at the beginning of the shift, at approximately 10:15 a.m. After the meeting had commenced, Hassan and two superior supervisors interrupted and informed the assembled employees[5] that the meeting was unauthorized, and that they must return to work. Thorpe responded that the meeting was authorized. After repeating the instruction to return to work, the supervisors left the room. Although the precise timing of the subsequent events is disputed, the parties agree that at some point quickly thereafter the supervisors reentered the room and discharged the eight probationary employees and suspended the remaining ten. A subsequent arbitration hearing endorsed the actions of the supervisors, but reinstated all of the suspended employees. The Transit Authority later offered reinstatement to the discharged probationary employees as well.

In an incident that plaintiffs contend is related to the March 1st events, plaintiff John Simino ("Simino"), the local union Shop Chairman at the Transit Authority's Coney Island Maintenance Facility, was disciplined for his involvement in a quarrel on April 14, 2000 with defendant

---

[4] Thorpe called the union meeting in order to discuss the complaints several of the plaintiffs had filed regarding Hassan. Defendant Ragusa, superintendent of the 240th Street shop, conducted an inquiry into the complaints, followed by the Transit Authority's offices of Policy Compliance and Civil Rights, the latter of which found the charges meritless.

[5] In attendance at the meeting were all of the plaintiffs with the exception of Desruisseu, Doherty, Blackman, and Simino. Several other employees, not parties to this action, were also present.

Arthur Corpuz ("Corpuz"), a maintenance supervisor. Simino, who had been involved in union-organized protests against various Transit Authority figures in the aftermath of the March 1st events at the 240th Street shop, allegedly assaulted Corpuz when the latter took a letter from Simino's hands relating to a union member's impending grievance arbitration. Corpuz filed formal charges with the Transit Authority, and a tripartite arbitration board found the supervisor's version of events to be credible, suspending Simino for twenty days.

In another allegedly related matter, plaintiffs Carlos Blackman ("Blackman") and Thomas Doherty ("Doherty") were disciplined for their involvement in an incident at the 240th Street shop on April 12, 2000. Blackman and Doherty, subway car inspectors and, respectively, the local union Shop Chairman and Vice-Chairman at the 240th Street shop, were directed on that day by defendant Eugene Frugone ("Frugone"), a deputy superintendent, to open the on-site union office's door and remove the contents within. Doherty had been informed of the move two days earlier, and had asked for and been granted an extension of the moving date until the 12th. When Frugone asked Doherty to open the door, he refused, and two other employees ultimately pried the door open with a crowbar. Doherty was taken out of service for insubordination, a charge later sustained in disciplinary hearings conducted before the tripartite arbitration board; he was allowed to return to work the following day. Blackman was docked fifteen minutes pay for being away from his workstation during the incident.

Plaintiffs further claim that plaintiff Ernst Desruisseu ("Desruisseu") was terminated in retaliation for complaints he made to a supervisor conducting an investigation of the 240th Street shop. Desruisseu, a probationary employee who was not present at the March 1st union meeting, was discharged on April 25, 2000.

2. <u>Plaintiffs' First Amendment claims</u>

Plaintiffs contend that defendants violated their First Amendment rights of free speech and association by disciplining them in retaliation for filing complaints of race and sex discrimination and participating in union activities.[6] To state a prima facie case for an illegal retaliation claim, plaintiffs must demonstrate 1) that their speech or actions constituted speech on a matter of public concern, <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983), and 2) that the speech was "at least a 'substantial' or 'motivating' factor" in the adverse action taken by the employer. <u>White Plains Towing Corp. v. Patterson</u>, 991 F.2d 1049, 1058 (2d Cir.1993) (quoting <u>Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle</u>, 429 U.S. 274, 287 (1977)). To determine whether the plaintiffs' discrimination complaints or union activities implicate public concern, the court examines the "content, form, and context [of those actions] as revealed by the whole record." <u>Connick</u>, 461 U.S. at 147-8 (1983).

The Second Circuit has stated that speech or actions "personal in nature and generally related to [one's] own situation" do not constitute protected speech. <u>Ezekwo v. NYC Health & Hosps. Corp.</u>, 940 F.2d 775, 781 (2d Cir. 1991) (holding that a physician's complaints related primarily to her own standing within a residency program were not protected). Here, plaintiffs were colleagues on a single shift and filed complaints of racial and sexual harassment charging only their direct supervisor with wrongdoing;[7] further, the March 1st union meeting was called, according to plaintiffs' complaint, to "utiliz[e] union officers to make complaints about unfair, discriminatory treatment" allegedly perpetrated by the same supervisor. (Compl. ¶ 14).

---

[6] Although plaintiffs' complaint purports to allege violations of due process under the Fourteenth Amendment, no facts or arguments are presented in support of this claim in either the complaint or memoranda accompanying this motion.

[7] Plaintiff's complaint lists several grievances apparently filed by plaintiffs with the Transit Authority; supervisor Ahmad Hassan is the sole subject of these filings identified in the complaint. (Compl. ¶ 8).

Workplace discord between a single supervisor and his subordinates does not warrant First Amendment protection. Plaintiffs may not cast their personal work grievances in the light of public concern merely by offering the conclusory allegation that "the Transit Authority . . . adopted a policy of retaliating against union activists and those who complain too forcefully about race discrimination [and] sexual harassment," (Compl. ¶ 24). Plaintiffs have failed to set forth any evidence of system-wide Transit Authority retaliation against employee complaints of racial and sexual harassment or union activity. Where an employee seeking First Amendment protection is "not on a mission to protect the public welfare" but hopes merely to prosecute his own grievances, he has failed to implicate the public concern. Ezekwo, 940 F.2d at 781. Accordingly, plaintiffs have not stated a cognizable First Amendment claim.

3. Plaintiffs' retaliation claims

Plaintiffs allege that defendants committed four retaliatory employment actions in response to their complaints of race or sex discrimination, or assistance in the presentation thereof, in violation of Title VII and its New York State and New York City analogues, including 1) the suspension or discharge of shift employees present at the March 1st meeting, 2) the discipline of plaintiff John Simino, 3) the discipline of plaintiffs Thomas Doherty and Carlos Blackman, and 4) the discharge of plaintiff Ernst Desruisseu.[8]

In retaliation cases, courts apply the three-part burden shifting analysis established by the United States Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-04

---

[8] Although in several instances the alleged retaliation occurred while plaintiffs were engaged in union activities, claims II, III, and IV of plaintiffs' complaint allege retaliation only for complaints, or assistance in the making of complaints, about race or sex discrimination. Plaintiffs' First Amendment claim, by contrast, alleges that plaintiffs were disciplined specifically for engaging in union activities.

(1973); see also Gordon v. New York City Bd. Of Ed., 232 F.3d 111, 118 (2d Cir. 2000).[9]  A *prima facie* case of retaliation requires 1) that plaintiffs participated in a protected activity, 2) that plaintiffs suffered an adverse employment action, and 3) that a causal connection exists between the protected activity and the adverse employment action. McMenemy v. City of Rochester, 241 F.3d 279, 282 (2001).  Plaintiffs need satisfy only a *de minimis* burden of proof at the *prima facie* stage, after which the burden shifts to defendants to rebut plaintiffs' case by identifying a legitimate, non-discriminatory reason for the adverse action. Weinstock, 224 F.3d at 42.  Once defendants have identified such a reason, the "presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Id.  The burden then shifts back to plaintiffs to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [the discrimination alleged by plaintiff] was the real reason for the [adverse action]." Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994). Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996).

(a.) Retaliation claims of employees disciplined or discharged at the March 1st union meeting

Plaintiffs state a valid *prima facie* case with respect to the 240th Street shop employees disciplined or discharged in the wake of the March 1st union meeting.[10]  These plaintiffs allege that they were suspended or discharged in retaliation for filing complaints of race and sex discrimination with the Transit Authority.  By holding a union meeting to discuss those charges,

---

[9] Plaintiffs' Title VII, New York state law, and New York City law claims are to be scrutinized under the same standard. Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) ("The identical standards apply to employment discrimination claims brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York").

[10] These include plaintiffs Thorpe, Alonzo, Brown, Bynum, Edwards, Jenkins, Moody, Albert, Berkely, Glover, Guilamo, Hibbert, Lewis, Pointdexter, and Ryan.

the employees in attendance were indeed engaging in a protected activity. See Wimmer v. Suffolk County Police Dept., 176 F.3d 125, 135 (2d Cir. 1999) (finding that "opposition . . . directed at an unlawful employment practice of an employer" is a protected activity). Plaintiffs also demonstrably suffered an adverse employment action on that date, given that ten were suspended and eight dismissed. Finally, plaintiffs successfully aver a causal connection between the protected activity and the adverse employment action of March 1st by presenting evidence that the discipline followed closely on the heels of the filing of the grievances against defendant Hassan. Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (finding a causal connection sufficiently factually supported where an employee was suspended within a month of filing an Equal Employment Opportunity Commission complaint against her employer); see also DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) ("The causal connection between the protected activity and the adverse employment action can be established indirectly . . . by showing that the protected activity was followed by discriminatory treatment").

Defendants, however, have successfully rebutted plaintiffs' charges of retaliation by presenting evidence that the suspensions and discharges of March 1st were predicated on legitimate, non-discriminatory grounds. The parties do not dispute the following facts: that supervisor Hassan granted defendant Vernon Thorpe, the Local 100 shop steward, permission to hold a union meeting during the employees' break or lunch period; that Thorpe and the employees commenced the meeting at the beginning of the work shift, rather than at the customary break or lunch times; that defendants Williams, Hassan, and Zachariah, all supervisors, interrupted the proceedings to inform the employees that the meeting was

unauthorized, and that they must return to work immediately; that the supervisors left the room; that they returned to find the employees had not moved;[11] and that supervisor Williams thereafter informed the employees that they were immediately to be taken out of service. A tri-partite arbitration panel subsequently ruled that the employees present at the March 1st meeting were properly charged with insubordination, effectively endorsing the actions of the supervisors. In light of these facts, defendants have successfully rebutted plaintiffs' *prima facie* case; the burden thus shifts back to plaintiffs to present evidence that exposes defendants' legitimate, non-discriminatory ground of insubordination as a pretext for retaliation.

Plaintiffs have not produced sufficient evidence to meet their burden in the third phase of the McDonnell-Douglas analysis. In order for plaintiffs' claims to survive a summary judgment motion, "[i]t is not enough ... to disbelieve the employer; the fact-finder must [also] believe the plaintiff's explanation of intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 50 U.S. 202, 519 (1993). Having presented little more than a litany of conclusory allegations in support of their retaliation claims, plaintiffs appear to rely solely on their *prima facie* case to defeat defendants' motion, and in so doing could not meet their "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Id. (quoting Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, (1981)).

At this stage of the McDonnell-Douglas analysis, the plaintiffs may proceed in one of two ways: either directly, by "persuading the court that a discriminatory reason more likely motivated

---

[11] There is some dispute as to precisely how much time elapsed between the order to return to work and the announcement that the employees were suspended from service. The tripartite arbitration panel hearing the disciplinary proceedings that resulted from the March 1st union meeting found that, despite inconsistencies in the parties' accounts, "each [employee present] had . . . an adequate opportunity to decide whether or not to disregard Williams's order and to incur the consequences and they all elected to stay." (Arbitration R. at 16, Pls.' Br. in Supp. of Mot. for Recons., Ex. 35).

the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. Plaintiffs' depositions and related materials are bereft of factual allegations that would permit a reasonable fact-finder to find defendants' legitimate justification for the March 1st suspensions and discharges suspect. Yet even suspicion that defendants acted pretextually will not satisfy plaintiffs' burden of persuasion, for "proffered reasons may be a pretext for a host of motives, both proper and improper, that do not give rise to liability under Title VII." E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1321 (10th Cir. 1992) (noting that discrimination is not shown merely because "some less seemly reason -- personal or political favoritism, a grudge, random conduct, an error in the administration of neutral rules -- actually accounts for the [adverse action]"). The federal, state, and city law retaliation claims of the March 1st plaintiffs do not survive the foregoing analysis.

(b.) Plaintiff Simino's retaliation claims

Plaintiff Simino alleges that defendant Corpuz falsely charged him with assault in retaliation for Simino's advocacy for the employees disciplined on March 1st. Simino states a valid *prima facie* retaliation case, having proffered evidence that 1) as a local union leader he had lately been active in the protected activity of protesting the disciplining of the 240th Street shop employees, see Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (finding protected "informal protests of discriminatory employment practices, including . . . expressing support of co-workers who have filed formal charges"); 2) that Corpuz suspended him from work; and 3) that his "vigorous involve[ment]" in the March 1st matter over the preceding weeks indirectly established a causal relationship between his support for the disciplined employees and his suspension.

Defendants respond by presenting evidence that Simino was suspended for assaulting Corpuz. None of the witnesses to the alleged assault corroborated Simino's version of events in the investigation that followed, (Simino Dep. at 124, Defs.' Br. in Supp. of Mot. for Recons., Ex. 33). Further, another employee at Simino's workplace described hearing Corpuz warning Simino to "not put your hands on me" over a walkie-talkie. (Id. at 122). A tripartite arbitration ruling on the disciplinary charges brought by Corpuz found his testimony to be credible.

Plaintiff Simino fails to present sufficient evidence to permit a reasonable fact-finder to conclude that defendants' stated reason for disciplining him is pretextual. Simino admits in his own deposition that in the six years prior to this incident he had, in his capacity as a union representative, "worked out disputes . . . [and] banged heads" with Corpuz repeatedly. (Simino Dep. at 120, Defs.' Br. in Supp. of Mot. for Recons., Ex. 33). This statement belies Simino's suggestion that Corpuz's charge of assault in the wake of this union dispute is suspicious. In light of Simino's acknowledgement that he had been involved in union disputes with Corpuz for years without any similar charges, Simino fails to adduce any evidence or offer any theory as to why this particular dispute would inspire a supervisor to fabricate such a serious charge. Simino also fails to present any evidence contradicting the statement of the employee who stated that he heard Corpuz tell Simino "do not put your hands on me." Simino's claim of retaliation collapses under the weight of defendants' legitimate, non-discriminatory reason for suspending him.

(c.) Plaintiff Desruisseu's retaliation claims

Plaintiffs allege that Desruisseu's discharge was premised on his involvement in complaints of discrimination at the 240th Street shop. Plaintiffs demonstrate a valid *prima facie* case, presenting evidence that 1) Desruisseu complained of discrimination to supervisors, 2) was

discharged, and 3) suffered the adverse employment action soon after making complaints. Defendants rebut plaintiffs' case decisively. Although he alleges that his discharge was without cause and in retaliation for discrimination complaints, Desruisseu concedes the following in deposition: that supervisor Hassan had submitted a report of Desruisseu's failure to observe rules and regulations; that at times he would remove his regulation vest in contravention of workplace rules and a supervisor's direct warning; that he was repeatedly required to clean his designated cars a second time, on at least one occasion having failed to remove graffiti, gum, and a sticker; that on October 23rd, 1999, Hassan filed another report of poor work performance, this time because he discovered Desruisseu reading a newspaper instead of cleaning; that he had reported late to work twice in the same month; and that he received a verbal, unsatisfactory evaluation on March 11th, 2000 from his supervisor, during his probationary period.

Plaintiff Desruisseu's own admissions fully corroborate defendants' legitimate, non-discriminatory reason for discharging him; defendants have also produced documents from Desruisseu's personnel file that support their allegations that he had a poor record.[12] The only other evidence that Desruisseu submits is a finding by the Unemployment Insurance Appeal Board that his actions did not constitute misconduct under the Unemployment Insurance Law. This two-page finding does not contradict Transit Authority findings, speaking as it does only to the narrow issue of unemployment insurance; it also appears from the hearing record that the only person presenting evidence at the hearing was Desruisseu himself. Plaintiff Desruisseu has failed to adduce sufficient evidence to overcome defendants' stated lawful grounds for dismissing him from employment.

---

[12] Plaintiffs' complaint alleges that Desruisseu was discharged "without good cause," (Compl. ¶ 20), yet plaintiffs acknowledge that, as a probationary employee, Desruisseu was not entitled to any kind of "just cause" discharge justification by the Transit Authority.

(d.) <u>Retaliation claims of plaintiffs Blackman and Doherty</u>

Plaintiffs Doherty and Blackman contend that they were suspended and docked fifteen minutes pay respectively in retaliation for their involvement in the March 1st matter. Plaintiffs state a valid *prima facie* case of retaliation, offering that 1) they had been engaged in the protected activity of opposing discrimination by their employer, 2) they were each disciplined, and 3) as with the other plaintiffs in this matter, Blackman and Doherty were disciplined soon after the March 1st conflict, which satisfies the causal element of the *prima facie* case.

Defendants rebut plaintiffs' case by presenting evidence that Doherty was suspended for failing to obey a direct order and for insubordination, and that Blackman was docked fifteen minutes' pay for his minor role in the same set of events. Although there is some dispute as to the timing, Doherty was informed in advance that the Transit Authority planned to move the union office at the 240th Street shop. Doherty requested and received permission to delay the move until April 12th, 2000. On that day, defendant and supervisor Frugone requested the key to the office door, which Doherty failed to provide. Ultimately defendants were forced to use a crowbar to open the office door. Defendants contend that the office was scheduled to be moved because entering it required passing through the men's locker room, which made female employees uncomfortable.

Doherty fails to present sufficient evidence that defendants' justification for his suspension was a pretext for retaliation for his involvement in opposing the discrimination alleged by the 240th Street employees. Although he claims that he was unaware that defendants decided to move the office on the grounds that female employees had complained, he also fails to present any evidence that challenges this motive. Further, although Doherty implies in his

deposition that the move was intended to eject the union from the shop, he admits that the office was simply moved to a lower floor away from the men's locker room. (Doherty Dep. at 113, Pls.' Br. in Supp. of Mot. for Recons., Ex. 12). Finally, Doherty, who admits that he had the office key on the premises, does not offer any evidence that would permit a reasonable finder of fact to disbelieve defendants' assertion that Doherty's refusal to open the office door, on the moving date he approved, served as the grounds for his (one day) suspension. Doherty's speculative and conclusory allegations do not support an inference of discriminatory intent here sufficient to satisfy his burden.

(e.) <u>Race and sex discrimination claims</u>

Plaintiffs allege discrimination on the basis of race, sex, and national origin under Title VII. To sustain a valid *prima facie* case of discrimination, plaintiffs must demonstrate that 1) they belong to a protected class, 2) that they were qualified for the positions they held, 3) that they suffered adverse employment action, and 4) that adverse action "occurred in circumstances giving rise to an inference of discrimination on the basis of [plaintiffs'] membership in that class." <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 36 -38 (2d Cir. 1994). The court recognizes that direct evidence of an employer's discriminatory intent is rare, thus discrimination victims "are usually constrained to rely on circumstantial evidence." <u>Id.</u> at 37. The court "will not accept 'naked assertions' unsubstantiated by specific factual support" to establish a *prima facie* case of discrimination. <u>Tripp v. Long Island Univ.</u>, 48 F.Supp.2d 220, 223 (E.D.N.Y. 1999) (quoting <u>Martin v. New York State Dep't of Mental Hygiene</u>, 588 F.2d 371, 372 (2d Cir.1978)). Plaintiffs' claim of employment discrimination, therefore, must fail. Plaintiffs have not presented any direct or circumstantial evidence from which a reasonable fact-finder could

infer a causal relationship between the plaintiffs' protected class membership and the discipline to which they were subjected. Plaintiffs' complaint, briefs in support thereof, and discovery materials are devoted almost exclusively to supporting their claims for retaliation. Although much of this case is predicated on plaintiffs' initial complaints to the Transit Authority of race and sex discrimination, plaintiffs do not produce any evidence in support of those allegations beyond what an independent investigation by the Transit Authority Office of Civil Rights deemed to be unreasonable and speculative. No specific allegations exist in any of their materials. Even plaintiffs' suggestion that their various instances of discipline were improperly motivated on the basis of race, sex, or national origin is bereft of factual support. Plaintiffs' evidence of employee-supervisor friction and disagreement over the conduct of union activities fails to support any of the claims in this lawsuit.

CONCLUSION

Plaintiffs have not demonstrated excusable neglect for their failure to prosecute this case. Moreover, a consideration of the record on defendants' summary judgment motion indicates that this court would have dismissed this case on its merits. Vacating this court's order of dismissal is therefore unwarranted and would be a futile gesture. Plaintiffs' motion to reconsider pursuant to Rule 60(b) is denied.

Dated: August 3, 2005
     New York, New York

SO ORDERED:

_____
GEORGE B. DANIELS
United States District Judge